IN THE

# SUPREME COURT OF TENNESSEE,

FOR THE

# MIDDLE DIVISION.

NASHVILLE, . . . . . . . . . DECEMBER TERM, 1881.

SUSAN WHITE and EMMA C. WHITE v. W. H. BLAKE-
MORE et al.

1. VENDOR'S LIEN. *Administrator. Statute of limitations.* Although the
estate of a deceased debtor may be protected by the statute of limita-
tions of three and seven years from the recovery of judgment against
the personal representative on particular debts created by the pur-
chase of land by the debtor, yet the lien retained on the land by the
reservation of the title, would not be impaired thereby, and may be
enforced against the heirs. It would be otherwise in the case of a
mere equity growing out of the existence of a debt, not secured by
contract lien.

2. VENDOR AND VENDEE. *Mortgagor and mortgagee. Lien of vendor. Ad-
verse possession.* The relation of a purchaser of land by title bond to
his vendor is similar to that of mortgagor and mortgagee, and his
possession is not adverse to the lien of the vendor until it is made so
by notice of a hostile holding; nor is the possession of his privy in
blood or estate, the condition of the title being notice of the outstand-
ing equity.

3. SAME. *Title bond. Notes for purchase money.* Where the notes men-
tioned in a title bond as given for the purchase of land are not de-
scribed, and the notes actually executed embrace other considera-
tions, the reservation of title will enure to the security of the pur-
chase money in the notes.

4—VOL. 8.

4. SAME. *Evidence.* If the vendor of land may show by parol proof that certain notes calling for a larger sum of money than that mentioned in the title bond were given for the land, or were to be secured by the reservation of the title to the land, the burden of proof would be on him, and, after the lapse of over forty years, the proof should be clear and conclusive.

5. PAYMENTS. *How applied.* Where the debtor directed payments made by him to be applied on certain notes, given in part consideration for land sold by bond for title, and in part for other considerations, and the debtor at the time applied the payments accordingly, equity will apportion the payments *pro rata* between the two considerations.

6. TENANTS IN COMMON. *Sale of respective shares by title bond.* When tenants in common of land sell their several shares at a given price for each share, separate notes being executed to each tenant for the purchase money of his share, each tenant can only subject his share of the land to the satisfaction of the purchase money due him, although all the tenants may join in executing one title bond.

---

FROM BEDFORD.

---

Appeal from the Chancery Court at Shelbyville. JOHN W. BURTON, Ch.

COOPER & FRIERSON for complainants.

W. S. BEARDEN and THOS. S. MYERS for defendant.

COOPER, J., delivered the opinion of the court.

Bill filed April 15, 1879, to enforce a lien for unpaid purchase money on land sold, by bond for title, on November 19, 1836, to Daniel L. Barringer, the grandfather of the defendants. The chancellor dismissed the bill, and complainants appealed.

Many years ago, in the year 1811, Wm. White, spoken of in some of the papers as late secretary of State of North Carolina, died leaving a widow Anna

White, and six daughters Emma White, Susan White, Sophronia White, Eleanor who intermarried with David L. Swain, Elizabeth who intermarried with one Felton, and Ann who intermarried with Daniel L. Barringer. The deceased owned lands in Tennessee, and probably made a will devising his property equally to his widow and children. At any rate, all the conveyances in the record take for granted the equal interest of these parties, and the land in controversy was, after the death of Wm. White, conveyed to the widow and children by the heirs of Robert White. The family lived in Raleigh, N. C., and we learn from the depositions of the complainants, taken in this cause, that they continued to live in the house in which they were born. Barringer and wife, after their intermarriage, moved to Bedford county, Tennessee.

In November, 1836, several instruments of conveyance or sale were executed between these parties. One of them seems to have been dated on the 18th, and the residue on the 19th of that month, but they are manifestly all parts of one transaction. The instrument of the 18th of November, is a formal deed by which Daniel L. Barringer and his wife Ann convey to Anna White, the widow, and to Elizabeth Felton, Susan White, Emma White, Sophronia White, and David L. Swain and wife Eleanor, the interest of Barringer and wife, described as one undivided seventh, in the land in controversy in fee. The consideration expressed is $400 paid. The land is set out by metes and bounds, lying on Sugar creek in Bedford county, Tennessee, and described as containing seven hundred

acres, "more or less, it being the residue of a tract of land of one thousand acres granted by the State of Tennessee to Robert White by grant No. 618, and conveyed by the heirs of Robert White to the widow and children of Wm. White, deceased, and of which Daniel L. Barringer and wife are entitled to one-seventh."

On November 19, 1836, Anna White, Elizabeth Felton, Susan White, Emma White, Sophronia White and David L. Swain join in a bond for title to Daniel L. Barringer, in the penalty of $5,600, conditioned that each of the obligors in their own right, and Swain in the right of his wife also, would, upon the payment by the said Barringer of his bonds given as consideration for the land, execute, or cause to be executed to him a good and sufficient deed in fee simple, with covenants of warranty, to the same tract of land of seven hundred acres, describing it by metes and bounds. The title bond, as it is copied into the record, is defective in the recital of the consideration, probably by a clerical error of the copier of the transcript, as the written arguments of both parties agree in relation to its purport. Supplying the missing words in brackets, the clause will read thus: "And for consideration for the same, [the said Daniel L. Barringer has executed to] the said Anna White, Elizabeth Felton, Susan White, Emma White, Sophronia White and David L. Swain his several bonds under seal, and bearing date herewith, in the sum of $2,800, said bonds falling due at different times as specified upon their face."

On the same day, David L. Swain and Eleanor his wife conveyed to Daniel L. Barringer, "in consideration of five hundred and —— dollars" paid, all their interest, being an undivided seventh in right of Eleanor "as heir or devisee of Wm. White," in and to several tracts of land in Tennessee, described by metes and bounds.

On the same day, Anna White, Elizabeth Felton, Susan White, Emma White and Sophronia White join in a conveyance of their interest in the same lands, "as heirs and devisees of Wm. White," to Daniel L. Barringer in fee, reciting a consideration of $2,750 paid.

The sum of these several instruments is that Barringer and wife convey their one-seventh of the land in controversy to the widow and other children of Wm. White for $400, and these latter immediately covenant, · by title bond, to convey the whole tract to Barringer upon the payment of his bonds for the purchase money, recited as $2,800. At the same time, the same parties sell to Barringer their interest in the other lands of Wm. White's estate in Tennessee, at the price of $3,300.

The bill is filed to subject the land mentioned in the title bond to the satisfaction of the bonds of Barringer executed to the complainants and their sister Sophronia for the purchase money of their shares. The complainants did not have the title bond before them, which at the time was supposed to have been lost, but they allege that their covenant to convey was by bond for title or agreement in writing. They say that Barringer executed to each of the five bargainors

his three several notes under seal for $300 each, all
dated November 19, 1836, and made payable January
1, 1839, January 1, 1840, and January 1, 1841, re-
spectively, with interest from date "to be paid annually."
They state that all of these notes have been paid by
Barringer or his personal representative, except the
notes executed to them and to their sister Sophronia;
that on these latter notes numerous payments have
been made from time to time, and credited on the
back thereof, the last payment having been made,
December 24, 1862, by J. A. Blakemore, administra-
tor of Barringer, and also the husband of Barringer's
only daughter.　They aver, and afterwards proved,
that their sister Sophronia intermarried, June 6, 1857,
with John Walker; that Walker died September 7,
1876, and Sophronia on December 9 of the same year,
both intestate and childless; and that upon her death
Sophronia delivered her notes to complainants as a
gift.　They produce and file the notes, which cor-
respond with the description of the bill, and they and
their sister Elizabeth Felton depose that the notes were
executed for the land.　They undertake to explain
the delay in asserting their rights by saying that the
notes were made for the purpose of securing them
and their sister a small yearly income, and that their
rights had always been recognized up to the death of
J. A. Blakemore on February 4, 1878.

The defendants, in their answer, admit the sale of
the land to Barringer, but deny the terms of sale as
alleged, saying: "While it is probably true that com-
plainants hold the several notes described in their bill,

they deny that the notes were given for the purchase of the land in question." They rely on the statutes of limitation, laches and lapse of time.

It will be noticed that the bonds as mentioned in the title bond are "in the sum of $2,800." Three bonds of $300 each to each of the six bargainors would be $5,400. And no addition of the bonds would correspond with the sum recited.

Daniel L. Barringer died in 1852, leaving a widow and one daughter surviving. The daughter had married J. A. Blakemore. Blakemore qualified as the administrator of Barringer's estate. Barringer's widow died about 1859, his daughter in 1873. Barringer lived on the land in controversy until his death. Blakemore and wife continued in possession of the land until her death, and Blakemore retained possession until his death in February, 1878. The defendants are the children of Blakemore and wife.

Anna White, the widow of Wm. White, died February 20, 1850, and, on November 4, 1851, a general settlement was had between Barringer and wife on the one part, and her sisters on the other part. The result, as embodied in a written agreement signed by the parties, was that the other parties purchased the interest of Barringer and wife in certain property specifically set out, presumably in North Carolina, at the price of $3,922.25, of which the greater part was paid in a mode designated, leaving a balance due to Barringer of $966.75. As to this balance, the agreement recites that Susan White, Emma White, and Sophronia White have each given the said D. L.

Barringer credit on his notes, which they respectively held against him, for $322.26. Each set of the notes introduced in evidence is accordingly credited with this sum as of November 4, 1851. And Barringer himself, on his copy of the agreement, made a memorandum in writing that he was indebted to each of the three sisters in three notes of $300 each, describing them and the credits thereon, so as to correspond exactly with the notes offered in evidence by the complainants.

The complainants produce and file letters to show a knowledge of their claims, and continuous recognition. The first letter is from Barringer's daughter under date of January 29, 1850. She wrote to one of the complainants that she was sorry her father had ever bought the lands in Tennessee as they had been a source of trouble to him, and added that he had sold all the lands except the place he lived on, concluding thus: "I learned from aunt Betsy that you all had a lien on that, so I hope there will be nothing lost." On April 14, 1852, Barringer himself wrote to Swain, in reference to the hope expressed by Swain to him in a recent letter "of receiving a considerable sum of money on the girls' notes," that his only source for raising the money was by a sale of the land on which he lived, and which he had been trying to sell without success. He seems afterwards to have sold two hundred acres to one Barrett for $3,600, as will presently more fully appear. On December 6, 1853, after Barringer's death, Blakemore wrote to Swain, concluding with the following post-

script: "Please say to the Misses White that I will send them a check for $500 by the 15th of January." On January 18, 1854, he did enclose to Swain a draft on New York for $500, which he directed him' "to place as a credit on Gen. Barringer's notes." Blakemore made payments in 1853, 1854, 1855, 1856, 1858 and 1862, all of which were equally divided between complainants and Sophronia. The last of his payments was made December 24, 1862, and amounted to $666.66 for each of the three sisters. On January 27, 1877, Blakemore, then confined to his bed by severe illness, directed one of his sons, who was writing to Elizabeth Felton, at Raleigh, N. C., to ask her to send him, as the writer worded the message, "a copy of the notes, with their credits, which you all hold against grandfather for land purchased in Tennessee."

Barringer in his lifetime sold two hunded acres of the land to one Barrett. On May 26, 1856, the lawyer of Barrett, at the request of Blakemore, wrote to Swain that no deed could be found for the land, and requesting a deed. Swain replied, June 11, 1856, that he was not surprised that no deed was found, as he was very certain none was ever executed. Gen. Barringer, he says, gave his bonds for the purchase money, and the vendors covenanted to convey the title upon the payment of his bonds. He expresses a willingness, however, to make a title to the land sold, adding that a conveyance of the residue will be made when the purchase money is fully paid. In another letter of the 30th of the same month, in which

he speaks of having also written to Blakemore on the subject, Swain explains that Barringer and wife had conveyed their interest in the land in controversy in 1839 in part payment for other lands, and given his bonds to his wife's sisters for $900 each, they giving him their bond to convey to him the land upon the payment by him "of these several sums of money." On July 21, 1856, a deed was drawn up by Swain, which was executed by the complainants, and by Sophronia White, Elizabeth Felton and Swain and wife, conveying the two hundred acres sold to Barrett in fee to Blakemore as administrator of D. L. Barringer. This deed recites the agreement of the 19th of November, 1836, as obligating the vendors to convey the land upon the payment to them of $4,500, and recites further that Barringer had died after making various payments on account, "but leaving a considerable sum due and unpaid."

Elizabeth Felton proves, upon her examination as a witness in this case, that she was to get $900 for her interest in the land, the same as each of her sisters, and that Barringer paid her at the time in cash $600, and gave her his note for $300. This note, with the payments endorsed, she sent as a gift to Blakemore's daughters, after his death. D. L. Swain died in 1868. The deposition of his widow is taken in this cause to prove his handwriting. She makes no claim for unpaid purchase money.

It is clear, from the foregoing statement, that Barringer did, on November 19, 1836, purchase the land in controversy, and execute the three sets of notes

sued on; that he made several small payments on them prior to November 4, 1851, on which latter date he received a credit of $322.26, by express contract, on each set; and that he recognized his liability thereon by letter of April 14, 1852. It is also certain that Blakemore and wife, who continued to occupy the land after Barringer's death in right of the wife as the only heir of Barringer, knew that the notes were outstanding, and understood that they were a lien on the land. It is clear moreover that Blakemore, either as administrator of Barringer, or as agent of his wife as heir, and as tenant by the curtesy, made payments to each of the three sisters on the notes sued on, the last and largest payment being on December 24, 1862; and that he treated the notes as unpaid shortly before his death by calling for a "copy of the notes with their credits." If the notes, or the debts evidenced by them, were a lien on the land, there is nothing to show the holding of the land in hostility thereto.

The notes were under seal, and therefore not within the general statutes of limitations. These statutes did not apply to sealed obligations previous to the adoption of the Code in 1858, and the limitations of that compilation were restricted to causes of action accruing after the first of October of that year: Code, sec. 47. And the proof effectually disposes of any presumption of payment arising from lapse of time. The personal representative of Barringer would, it is true, be protected by the statutes of three and seven years in favor of the estates of decedents. But

the lien retained on the land sold by the reservation of the legal title and by contract would not be impaired by the bar of the right of action against the personal representative : *Snow* v. *Booth,* 8 De G. M. & G., 72 ; *Bank of Metropolis* v. *Guttschlick,* 14 Pet., 19 ; *Heyer* v. *Pruyn,* 7 Paige, 465 ; *Barned* v. *Barned,* 6 C. E. Green, 245 ; *Harris* v. *Vaughn,* 2 Tenn. Ch., 483. The relation of a purchaser by title bond to his vendor is similar to that of mortgagor and mortgagee, and his possesion is not adverse to the lien of the vendor, until it is made so by notice of a hostile holding : *Gudger* v. *Barnes,* 4 Heis., 570 ; *Wood* v. *Neely,* 7 Baxt., 586. And this would be so as against privies in blood or estate, the condition of the title being notice of the outstanding equity : *Gudger* v. *Barnes, ut supra.* There has been no adverse holding in this case up to the death of Blakemore. Neither he, nor the defendants, nor their mother ever gave notice of an intention to dispute the lien. Unless there is some other valid defense, the lien would be enforceable.

The defendants in their answer, while conceding that the complainants hold the notes as claimed by them, deny that the notes are a lien on the land. And it is certain, as argued by their counsel, that the title bond of November 19, 1836, recites the consideration of the sale of the land as only $2,800, which would make the consideration of each share correspond with the valuation of the share of Barringer and wife in the same land as set out in their conveyance of the previous day. It is also true that the consid-

eration of $900, as evidenced by the notes and deposed
to by the complainants and their sister, would make
the entire consideration largely exceed the sum men-
tioned, and is not a multiple of that sum.  But the
evidence and the circumstances leave no doubt that
the notes produced were the notes executed by Bar-
ringer at the time, and were given in whole or in
part for the purchase money of the land.  They would
answer the description of the title bond to the extent
of the actual consideration, although they might also
include other considerations.  To the extent of the
purchase money of the land, they would constitute a
lien beyond question.

Can we look outside of the terms of the title bond
to ascertain whether the entire amount called for by
the notes was in fact purchase money of the land,
or, even if not purchase money, was nevertheless
charged upon the land so as to constitute a lien upon
it?  The consideration for the sale of land, it has
been held by this court, is not required to be in
writing by our statute of frauds: *Whitby* v. *Whitby*,
4 Sneed, 473; *Gass* v. *Hawkins*, Thomp. Cas., 243.
When the consideration is expressed in the writing,
the recital is only *prima facie* evidence, and the true
consideration may be averred in pleading, and shown
by parol proof: *Perry* v. *Southern R. Co.*, 5 Cold., 138;
*Mowry* v. *Davenport*, 6 Lea, 80, 93.  An absolute deed
may be shown by parol to be a mortgage to secure
a specific debt: *Ruggles* v. *Williams*, 1 Head, 141.
So, in the case of a title bond, a parol contract that
the title retained should stand as security for a new

debt, not a part of the consideration of the land sold, would be good: *James* v. *Fields,*, 5 Heis., 394. So, of an executory agreement touching land: *Jones* v. *Jones,* 1 Head, 108. And if in the contract of sale a lien be retained to secure a debt for borrowed money, the lien will be good: *Trezevant* v. *Bettis,*, 1 Leg. Rep., 48. A person having the legal title to land may retain it to secure any indebtedness due to him from the equitable owner, or those claiming under him, even if the indebtedness do not grow out of the land: *Williams* v. *Love,* 2 Head, 80. But whether the latter equity would admit of active enforcement against heirs, after the personal estate of the ancestor has been protected against the debt by the statutes of limitations intended for that purpose, has not been adjudged.

Under these authorities, there can be little doubt that the complainants might show by parol testimony either that the notes in controversy were given for the purchase money of the land covenanted to be conveyed, or that the legal title was retained to secure the payment of the notes by special contract between them and the vendee, and either contemporaneously or subsequently. The burden of proof would be on the complainants, and, after the lapse of over forty years, the proof ought to be very clear and satisfactory.

The complainants and their sister Elizabeth Fenton do say that the notes produced were given for the purchase money of the land, and the title retained to secure their payment. Swain seems to have entertained the same view, at any rate to the extent that the title to the land was reserved to secure the notes.

His language, which differs in the transcript from that given in the argument submitted on behalf of the defendants, is: "Gen. Barringer and his wife conveyed their title to the Sugar creek tract in 1839, in part payment for lands on Wilson's creek and elsewhere, and gave his bonds to Mrs. Swain and her sisters for $900 each. They, upon their part, gave their bond to Gen. Barringer to convey the title to the Sugar creek tract upon the payment of these several sums of money." And in the deed drawn up by him for the two hundred acres to Barrett he makes the following recital: "And whereas the said parties of the first part did, on the 18th day of November, 1836, enter into a contract and agreement with the said Daniel L. Barringer to convey to him a tract of land, which they owned, lying on Sugar creek in the said county of Bedford, containing seven hundred acres more or less, upon the payment to them of the sum of four thousand five hundred dollars." The bargainors in this deed are the five sisters, and he is the husband of one of them.

The depositions of the complainants and their sister were taken without having the title bond before them, which was then supposed to be lost. It was afterwards found and filed, but neither party retook their depositions to explain the discrepancy between their recollection as deposed to and the recitals of the instrument. And the question is what effect shall the evidence have against the writing. Treating the recital of the latter as true, it is almost certain that the notes were given not only in consideration of the

land in controversy, but in consideration of the other lands sold at the same time. And it is highly probable that it was intended that the title to the land should be retained to secure the payment of the notes. But this was not done in the bond for title, nor is there any direct evidence to that effect. The theory of the bill is that the notes sued on were given for the land itself which is sought to be reached, and the evidence is to the same effect. The writing is unquestionably the best evidence, and is in conflict with the theory. The recitals of one of the other instruments executed at the same time is in accord with the title bond, and the two remaining deeds show the creation of an indebtedness of the vendee to the vendors, which, in the absence of any testimony to the contrary, there can be little doubt, was included in the notes executed at the time. That indebtedness has been extinguished as against the estate of the debtor by the statutes of three and seven years, and not having been fixed as a lien on the land by contract cannot be enforced against it.

In this view, the recovery of the complainants must be limited to so much of the debt evidenced by the notes as constituted the consideration money of the land in controversy. That would be the sum of $466.66 of each set of notes with interest payable annually. The general rule in this State, in respect to the appropriation of payments is, that a debtor owing different debts to the same person has a right to apply the payment at the time when made to either debt, and if he fails to do so, and the payment be

general, the creditor may apply it, and where no appropriation is made by either party, the law will apply it according to the intrinsic justice and equity of the case: *St. Louis Type Foundry Co.* v. *Wisdom*, 4 Lea, 698 and cases cited. In this case, both the debtor and the creditor concurred, the one in directing, and the other in applying the payments to the notes sued on, without giving a preference to either consideration. The intrinsic justice and equity in such a case would be to apportion the payments *pro rata* between the two considerations.

It remains to be considered whether the lien for the balance of debt due to complainants, under the foregoing rulings, can be enforced against the whole land, or against only a part of it, and what part. The contract between the parties, as shown by both the title bond and the other evidence, was that each owner of the land sold an undivided sixth interest, and received the purchaser's notes for an equal part of the purchase money. It was not a joint sale of the whole land for a single price to be paid to all of the bargainors, either at once or in instalments, but a separate sale of each share for a separate consideration. The obligation of the contractors is the same as if they had entered into separate covenants, except in so far as they may have made themselves sureties for each other for the performance of the obligation. There is nothing in the written instrument nor in the proof to change the legal effect of the contract. In this view, as the share of any owner was paid for, the purchaser acquired the right to de-

5—VOL. 8.

mand the legal title to that share. The bill concedes the payment of the purchase money of the shares of Anna White and Eleanor Swain, and Elizabeth Felton proves that her share has either been paid or donated to a portion of the defendants. The complainants are entitled each to subject her share to the balance of purchase money due her. They are also entitled to the balance of purchase money due to their sister Sophronia, and to subject her share of the land to the payment thereof, in so far as they may be able to make to the defendants a good title to that share. Upon Sophronia's death, the legal title would descend to her surviving sisters, and the defendants as the heirs of their deceased sister Mrs. Barringer. The legal title vested in the latter, would be a naked title subject to the equity of the complainants for unpaid purchase money. The complainants are, therefore, in a condition to perfect the title to three-fifths of this share. And they may be able, by procuring and filing in a reasonable time, the deed of Elizabeth Felton and Eleanor Swain, who are not before the court, to the other two-fifths to complete the title to the whole share. And it may be that the defendants are entitled to demand the deed of these two parties for the residue of the land, although they have not demanded it.

Judge Turney thinks that the complainants are entitled to enforce their whole debt against the entire unconveyed tract of land.

Something is said in the answers of the defendants, and the argument submitted for them, as to a defi-

·ciency in the quantity of the land sold.    But the sale was clearly in gross, not by the acre, and their an-cestor got all he bargained for:  *Moses* v. *Wallace,* 7 Lea, 413.

The decree of the chancellor will be reversed, and a decree entered in accordance with this opinion.